IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VANESSA PEARSON-RHOADS | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| AETNA LIFE INSURANCE COMPANY | : | No. 10-1076 |

## MEMORANDUM

Legrome D. Davis, J.                                                    October 28, 2011

This is an action for judicial review of an administrator's denial of disability insurance

benefits under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§

1001-1461; see Sections 502(a)(1)(B) and 503 of ERISA, 29 U.S.C. §§ 1132(a)(1)(B), 1133.

The case was removed from state court on federal question jurisdiction.  29 U.S.C. § 1132(e); 28

U.S.C. § 1331.

Plaintiff, Vanessa Pearson-Rhoads, a former employee of Quest Diagnostics, Inc., moves

for summary judgment to recover long-term disability benefits under a group disability insurance

policy issued by Defendant Aetna Life Insurance Company to Quest Diagnostics.  Doc. No. 22.

The policy is an employee welfare benefit plan governed by ERISA, 29 U.S.C. § 1002(1).  Aetna

cross-moves for summary judgment, submitting that it properly determined that Plaintiff was not

entitled to disability benefits.  Doc. No. 23.  Because Aetna's refusal of benefits was reasonable

and not an abuse of its discretion as plan administrator, Plaintiff's motion will be denied and

Defendant's motion will be granted.

## I.      PROCEDURAL AND FACTUAL BACKGROUND

Plaintiff, who is now 44 years old, was injured in a motor vehicle accident on January 12,

2007.  At that time, Quest Diagnostics employed Plaintiff as an internal account service

1

representative, a sedentary position.  She described her duties as "update contracts, enter data in computer, answer phone calls, contact clients, educate clients, fax, mailing."  Administrative Record ("R.")[1] 369, 630; R. 1173 (Quest Diagnostics on-line career description).

On June 26, 2007, Plaintiff applied to Aetna for long-term disability insurance benefits, asserting that as of the day of the accident, she stopped working because of "slow thought process, inability to multi-task, dizziness, inability to sit or stand for long periods of time, tremors, shaking/movement disorder, numbness hand/feet."  R. 630-43, 638.  She was unable to perform any work because of "tremors, dizziness, headaches, neck and back pain, fatigue, shaking/movement disorder, pain, lack of concentration, headaches, facial pain."  Id.  On November 14, 2007, Aetna denied the claim.  R. 941-47.  On February 1, 2008, Plaintiff initiated an administrative appeal, and on June 24, 2009, Aetna upheld the original denial of benefits.  Pl.'s 2/1/08 letter, R. 954; Def.'s 6/24/09 letter, R. 1634-40.

On February 8, 2010, having exhausted her administrative remedies, Plaintiff filed a complaint in the Philadelphia County Court of Common Pleas, which Aetna removed to this Court on March 11, 2010.  On February 15, 2011, the parties filed cross-motions for summary judgment, presenting the sole issue of whether Aetna's determination that Plaintiff was not disabled under the Policy,[2] based on the administrative record, was arbitrary and capricious.

_____

[1]  The voluminous Administrative Record in this case is Bates-stamped using the prefix "A" followed by a five-digit number.  Citations to the record will be made only to the page-number digits.

[2]  The Policy provides in part that a period of disability will be certified "if, and only for as long as, Aetna determines that you are disabled as a direct result of a significant change in your physical or mental condition occurring while you are covered under this Plan. . . ."  R. 75.  A participant will be deemed to be disabled during the first 30 months of disability where:  "You [the participant] are not able, solely because of disease or injury, to perform the material duties of your own occupation; except, if you start work at a reasonable occupation you will no longer be deemed disabled . . . ."  Id.

II.   <u>ADMINISTRATIVE RECORD</u>

Plaintiff, as an employee of Quest Diagnostics, participated in her employer's group long-term disability benefit plan.  The plan was funded by a Group Long Term Disability Insurance Policy, number GP-699840-A, issued by Aetna to Quest Diagnostics.  Aetna, as plan fiduciary and administrator, was given "complete authority to review all denied claims for benefits under this policy" and had "discretionary authority to determine whether and to what extent employees and beneficiaries are entitled to benefits; and construe any disputed or doubtful terms of this policy."  R. 57-58.  Here, Aetna found that Plaintiff was able to perform the material duties of her own occupation, and therefore, she was not disabled as defined by the Policy.  Policy, R. 75; Def.'s 6/24/09 letter, R. 1634.

The medical evidence of record, as developed by Aetna's claims administration department, reflects that after the January 2007 accident, Plaintiff was treated by 15 physicians and health care providers.  Diagnostic tests were performed, most of which produced normal findings:  January 15, 2007 MRI of the cervical spine (R. 776); January 23, 2007 MRI of the brain (R. 770); March 6, 2007 MRI of the cervical spine (R. 773-74).  A January 10, 2008 MRI reported "mild discogenic disease and facet anthropathy of lower lumbar spine" (R. 1193-99).  The objective tests did not explain the reported extent and severity of Plaintiff's symptoms.

On January 15, 2007, Plaintiff began treatment with her primary care physician, Dr. Carol Henwood, D.O.  R. 617.  On January 17, 2007, she also consulted a dentist, Thomas P. Sollecito, DMD "because she ha[d] noted some alteration in her bite and . . . significant pain and some numbness on the right side of her face."  R. 645.  Dr. Sollecito noted that Plaintiff reported pain, but her "occlusion looked grossly intact" and she "probably ha[d] an efflusion in her

temporomandibular joint ["TMJ"]." Id.  He recommended that she see a neurologist and a physiatrist, Larry H. Chou, M.D.  Id.  As reflected in a January 31, 2007 progress note, Dr. Henwood found that Plaintiff "sounds significantly improved," "voice not shaky," "tremors significantly improved," and "Xanax helped symptoms."  R. 755, 750-757.

On February 1, 2007, Plaintiff consulted Dr. Chou.  He found Plaintiff had a "tremor of unknown etiology," "neck pain and headache. . . ," and "numbness and tingling in her right more than her left arm."  R. 652-54.  Chou noted that Plaintiff denied "having a sense of anxiety," "a startle response," and "playing the accident over in her head," but admitted to "non-restorative sleep pattern."  R. 653.  Chou referred Plaintiff to a neurologist, Allan A Weber, M.D.

In early February 2007, Plaintiff consulted Dr. Weber about her complaints of tremor in the upper right arm, neck, and head.  R. 614-16.  Weber observed "the obviously disabling tremor," but was not able to reach a diagnosis.  Id.  He referred her to Norman Leopold, D.O., a movement disorder specialist.  On March 5, 2007, Dr. Leopold evaluated Plaintiff and reported his "impression" to Weber, commenting that her "history and examination is most compatible with the diagnosis of psychogenic tremor."[3]  R. 743-45.  Leopold found:  "There is no significant consistency to her tremor, either in frequency, direction, or amplitude.  With distraction, the tremor can be briefly suppressed.  The patient cannot perform . . . alternating movements, even with her tongue, without changing the character of her tremor."  R. 745.  He suggested psychiatric or psychological counseling.  Id.

---

[3]  Stedman's Medical Dictionary at 1476 (27th ed. 2000) defines "psychogenic" as:  "Of mental origin or causation. . . . Relating to emotional and related psychologic development or to psychogenesis." "Psychogenesis" is defined as:  "The origin and development of the psychic processes including mental, behavioral, emotional, personality, and related psychologic processes."

In progress notes dated March 14, 2007, Plaintiff's dentist, Dr. Sollecito recorded "[o]verall improvement of jaw ache. . . . Reports no pain just jaw discomfort." R. 822-24. He diagnosed "sprain of neck" and "spasm of muscle." R. 823.

In a follow-up office visit on March 15, 2007, Dr. Chou noted Plaintiff's "tremors are dramatically improved . . . , but it is still there." R. 677-78. He noted that she was scheduled for neuropsychiatric testing, finding this "appropriate in the absence of significant structural abnormalities identified on an MRI." R. 678.

On April 3, 2007, Dr. Weber again examined Plaintiff and reported his and Dr. Leopold's findings to Dr. Henwood. R. 612-13. Weber noted that Plaintiff "can have several hours at a time where tremor is not present" and "is able to function as far as dressing herself and keeping up with her hygiene and putting in her earrings." Id. "However, she finds that the tremors are exhausting and limits how much activity she can do in a day. She also finds the mental exertion and focusing on objects induces or worsens her headaches." Id.

On April 16, 2007, Tracey Gemzik, PA-C, a physician's assistant in Dr. Henwood's office, submitted to Aetna a Disability Attending Physician's Statement ("AP Statement"), listing Plaintiff's diagnosis as: "movement disorder, psychogenic tremor." R. 617. Gemzik noted that Plaintiff's subjective symptoms were: "headache, neck pain, tremor, fatigue, decreased concentration," but that the results of a CT scan of the head, an MRI of the brain and cervical spine, and an x-ray of the lumbar spine were "normal." Id. Plaintiff's prognosis was noted as "fair" and her "maximum medical improvement" would be reached in six-nine months. Her "limitations (physical and/or mental)" were noted as "unable to perform job of any kind" and her "restrictions" were noted as "no driving, no working." R. 620. Gemzik noted Plaintiff was not a

viable candidate for vocational rehabilitation, because she "needs psychiatric evaluation." Id.

In a follow-up office visit on May 10, 2007, Dr. Chou noted Plaintiff's tremors were "overall . . . improving." R. 679-80.  She reported "having a lot of pain in her back and upper back with a burning sensation down her back, into her hands and in her feet." R. 679.  However, Chou found that an MRI of her cervical spine revealed "no evidence of significant cord impingement or cord signal change" or "anything that would explain the burning sensation" and the MRI of her brain was "likewise unrevealing." Id.  Chou recommended an EMG of the upper limbs "simply to rule out any evidence of underlying neural pathology," although he "suspect[ed] this will be normal." Id.  An EMG performed on May 30, 2007 produced test results within normal limits.  R. 692.

On May 22, 2007, Ms. Gemzik submitted to Aetna another AP Statement for Plaintiff, noting the diagnosis of psychogenic tremor and most of the same subjective reports of symptoms as noted in January 2007.  R. 625-26.  In May 2007, Plaintiff was no longer under the care of Dr. Henwood's office for this condition; however, it was noted that Plaintiff was "able to perform all ADLs [activities of daily living], but "is unable to work at this time. . . . no work." Id.

Plaintiff continued to see Dr. Weber.  On April 17, 2007, Dr. Weber reported to Aetna's claims representative that Plaintiff had been diagnosed with a psychogenic tremor, which "does not have a primary neurologic etiology and I would have to defer your questions of prognosis and work capacity to a mental health specialist." R. 622 (also noting her "high amplitude tremor would likely be very distracting in a work environment").  After another office visit on June 4, 2007, Weber noted that she reported "her headache frequency and severity has decreased substantially" and the tremors "are slowly resolving." R. 873-74.  Weber submitted to Aetna a

July 9, 2007 AP Statement, noting that Plaintiff's "disability from her primary diagnosis (psychogenic tremor) requires treatment from mental health specialists (psychiatry, psychotherapy, psychology) which she has yet to initiate." R. 949.  On July 9, 2007, Weber examined Plaintiff and noted "improvement" and "near resolution of her external tremors." R. 871-72.  However, he noted her new complaints of "anxiety, possibly anxiety attacks and migrainous quality headaches." Id.  He suggested occipital nerve blocks and psychiatric care. Id.

In June and July 2007, Plaintiff participated in therapy at AquaSport Physical Therapy. On July 11, 2007, AquaSport noted that her tremors were the "primary complication," which were "slowly improving." R. 667.  It was also noted that she reported "ongoing cervical and upper back pain," "continued headaches as well as radicular symptoms," and "tingling and burning." Id.  According to AquaSport, the "subjective and objective findings appear[ed] to be consistent with neurological involvement," but her "rehabilitation potential [wa]s good." R. 668.

At Dr. Chou's suggestion, Plaintiff consulted Andrea LaBorde, M.D., a physical medicine and rehabilitation specialist, to assess potential traumatic brain injury.  In a July 19, 2007 letter to Chou, LaBorde detailed Plaintiff's subjective reports of symptoms, including pain, headaches, dizziness, changes in mood and personality, difficulty hearing and seeing, tingling in her legs and feet, slowed responses, problems sleeping, and fatigue.  R. 1852-54.  However, LaBorde noted: Plaintiff was "[p]leasant, cooperative, well groomed, dressed appropriately for the weather, [and] arrive[d] to her appointment early"; she had nausea with a maneuver used to diagnose vertigo, but no dizziness; she had "a constant resting tremor of her upper extremities and her head and neck." R. 1853.  In LaBorde's opinion, "the patient has probable craniocerebral trauma but diagnostic input is limited at this time. . . . There is a possibility the patient could also have

7

symptoms related to post-traumatic stress disorder." Id. LaBorde did not render a diagnosis,

choosing to wait for the results of a neuropsychological evaluation and sleep study. R. 1854.

Dr. Weber continued to follow Plaintiff's neurologic condition, reporting his findings to

Dr. Henwood's office by letters dated August 21 and October 2, 2007. R 869-70, 867-68. In

August 2007, Weber made no notations regarding tremor; he noted that Plaintiff reported

"headaches consistent with occipital neuralgia" and she had consulted a psychiatrist. R. 869. In

October 2007, Weber noted that Plaintiff reported follow-up visits with her psychiatrist and "for

the first time since her accident she has had several good days. She has lessening of her

tremors." R. 867. He further noted she was "pleased with the response" to new medication for

occipital neuralgia. R. 868.

In an August 22, 2007 progress report, Dr. LaBorde noted that Plaintiff continued to

report headaches, difficulties with sleep, tremors, ringing in the ears, and memory deficits. R.

1858-59. However, LaBorde observed that the "patient is in no acute distress." R. 1858.

LaBorde again assessed Plaintiff as having "probable craniocerebral trauma," but LaBrode was

still waiting for the results of the pending neuropsychological evaluation and sleep study before

making recommendations for therapy or medication. R. 1859.

Plaintiff consulted Yong S. Shin, M.D., a psychiatrist, first on July 26, 2007, and Plaintiff

continued to consult Dr. Shin and Ms. Sue Hardy, a counselor in Shin's office, until at least June

4, 2008. R. 1082-1113. Although Shin's treatment notes are difficult to read, Shin noted

Plaintiff's many complaints, including sleep disturbances, irregular appetite, crying spells,

irritability, rapid and severe mood swings, anxiety attacks, tremor, difficulty thinking and poor

concentration, vertigo, headaches, neck and back pain, and pain "all over the body." Id. Shin

8

diagnosed Plaintiff with generalized anxiety disorder, post-traumatic stress disorder, and depression.  Id.  In a June 4, 2008 report, Shin opined that Plaintiff was "disabled from working at her former job as a sales representative, or any job, at the present time."  R. 1083, 1950.

Plaintiff followed up with her dentist, Dr. Sollecito.  In a September 12, 2007 progress note, Sollecito recorded Plaintiff's report that her involuntary tremors were better.  R. 812.

Aetna forwarded Plaintiff's entire medical file for review by two independent physicians, Vaughn D. Cohan, M.D., board certified in psychiatry and neurology and Elana Mendelssohn, Psy.D., licensed psychologist in neuropsychology.  R. 926-29, 936-40.  Drs. Cohan and Mendelssohn did not examine Plaintiff.  In an October 29, 2007 report, Cohan opined that the medical records did not indicate a neurological impairment that would preclude Plaintiff from performing her own occupation:

> A review of the neurological records indicates that the tremulousness does resolve when the extremity is otherwise occupied, and it is also apparent that it does not interfere with performing fine manipulative movements of the upper extremities and hands as in dressing, grooming, and putting jewelry on and off.  Therefore, it is my opinion that the documentation is not indicative of a functional impairment for the claimant's own occupation . . . . There is no evidence in the medical records that the claimant's work functionality has been adversely affected by medication.

R. 928-29.  In an October 31, 2007 report, Mendelssohn opined that the medical records did not indicate a neuropsychiatric impairment that would preclude Plaintiff from performing her own occupation.  R. 939.  Mendelssohn based her opinion on the reports of Plaintiff's treating physicians and mental health care providers, which did not include any objective testing:

> [D]ocumentation from these providers did not include measurements of this claimant's functioning or clear description of direct and observed behavior to substantiate the presence of impairment in cognitive, emotional, or behavioral functioning. . . . In conclusion, the information does not support the presence of a functional impairment . . . .

R. 938-39 ("These notes primarily contain self-reported complaints and subjects of sessions as opposed to examination findings regarding the claimant's psychological functioning.").

By its November 14, 2007 letter, Aetna declined to pay Plaintiff long-term disability benefits. R. 954. In administrative appeal of this decision, Aetna allowed Plaintiff to submit additional medical documentation during February 2008 through April 2009. Plaintiff's claim on appeal was based not only on the initial diagnosis of psychogenic tremor, but also on chronic trauma-induced headache, unresolved sprain and strain of the back, muscular discomfort or pain, trauma-induced occipital neuralgia, injury to the right-side of the jaw, and mental issues: anxiety, panic, post-traumatic stress, and conversion[4] disorders and depression. R. 968-71; Def.'s Statement of Facts, Doc. No. 24 and Pl.'s Response, Doc. No. 28, ¶¶ 75, 77-78.

During the administrative appeal, Plaintiff submitted the report of Ruben Gur, Ph.D., Professor of Neurology, and Julie Thysen, Ph.D., Neuropsychology Postdoctoral Fellow, who evaluated Plaintiff's neuropsychological condition on May 23, 2007. R. 2039-44. In their report, Gur and Thysen noted that during testing, Plaintiff was "an alert and fully oriented woman. . . . [H]er frustration tolerance was good, and she was able to work for extended periods of time, taking only small breaks." R. 2040. Although they observed that Plaintiff's "head, neck, and right extremity and, to a lesser degree, her left extremity, appeared tremulous," "[n]o fine motor tremor was noted upon observation and during neuropsychological testing." Id. They noted that her gait and eye contact were within "normal limits" and her speech was "fluent and coherent."

---

[4] Stedman's Medical Dictionary at 406 (27th ed. 2000) defines "conversion" in part as: "An unconscious defense mechanism by which the anxiety which stems from an unconscious conflict is converted and expressed symbolically as a physical symptom; transformation of an emotion into a physical manifestation . . . ."

Id.  Also, '[s]he demonstrated no difficulty understanding verbal directions, and her

concentration was generally adequate for task performance."  Id.  Nonetheless, Gur and Thysen

concluded that the test results were incongruent and possibly inaccurate because Plaintiff's

> performance on tests of symptom validity revealed variable effort across the testing
> session, and evidence of mild exaggeration.  Therefore, the results of this
> neuropsychological assessment may not be an accurate reflection of her cognitive
> abilities.  In addition, she evidenced severe attentional deficits despite fairly intact
> performance on measures of memory.  This incongruent finding further supports the
> notion that these neuropsychological data may not be representative of her current
> cognitive status.

R. 2044, 2040 (noting 'it was apparent that at times she was not putting forth her full effort").

Gur and Thysen concluded Plaintiff's "clinical picture [was] most consistent with a conversion

disorder, with seizures or convulsions" and recommended "psychotherapy targeted at treating her

psychogenic tremor, anxiety and depressive symptoms."  R. 2044.

    In a June 9, 2008 addendum, Drs. Gur and Thysen noted that at the time of their initial

assessment on May 23, 2007, Plaintiff's "psychological distress . . . would likely have [had] a

negative impact on her activities of daily living . . . mak[ing] it difficult, perhaps impossible to

perform her normal duties at work."  R. 1490.  However, because they were not treating Plaintiff

in June 2008, they concluded that it was "not feasible to assess her psychological distress or the

severity of her conversion disorder," and they would not opine on her progress or when she could

return to work.  Id.  They recommended continued psychotherapy, noting "with proper treatment

in the form of psychotherapy . . . , it is possible that her symptoms will remit and she will be able

to resume her previous level of functioning. . . . [O]nce able, return to work would provide Ms.

Pearson-Rhoads with necessary structure as well as the ability to actively participate in society

and feel that she is making positive progress in her life."  Id.

Plaintiff began treatment for chronic pain with a new physiatrist, Edwin Numsuwan. M.D., on November 27, 2007, and continued the treatment through May 21, 2008. R. 1175-99. Dr. Numsuwan administered occipital nerve block injections on December 4, 2007 and January 4, 2008. R. 1175. During the first office visit, she complained of headache that "feels like my head is in a vise," ringing in her right ear, "pins and needles" sensation behind the eyes, blurred vision, and occasional "burning hot" sensations in both feet, among other complaints. In May 2008, however, Numsuwan's records noted overall improvement and "the posterior headaches still seem to be largely resolved." R. 1175-76, 1175-80. He did not mention or record any evidence of psychogenic tremor.

Following Plaintiff's office visit, Dr. Weber conveyed his findings in a December 11, 2007 letter to her primary care provider, Ms. Gemzik. R. 1331-32. Weber noted that Plaintiff was "in no apparent distress," reported "great success" with an occipital nerve block, was "very pleased with her dramatic response" to injections performed by Dr. Numsuwan, and was "beginning to experience relief from her chronic pain syndrome." Id. After another examination of Plaintiff, Weber conveyed his findings in a February 11, 2008 letter to her primary care providers, noting that her level of pain had "dramatically declined" and she appeared to be "neurologically stable with her current therapies." R. 1333-34. He noted that "aggressive" physical therapy techniques had increased some her symptoms, but the therapy had been adjusted. R. 1333. He further noted that she had continued psychotherapy and "has had a significant decline in both panic attacks and moments of anxiety." Id.

On January 11, 2008, Plaintiff began chiropractic treatment with Randy E. Yucha, D.C. In a May 5, 2008 examination report, Dr. Yucha noted that over the past five months of

treatment, Plaintiff had reported "some nice changes with levels of pain," some activities of daily living had been increased due to decreased pain, and her headaches were not as frequent or intense.  R. 1403-07.  Nonetheless, Yucha opined:

> [A]t this point she is disabled and is not able to work at her former job . . . . [S]he should not be employed in any part time or full time capacity . . . . [A]ny type of gainful employment would only make her condition worse.

R. 1406.

Plaintiff consulted Joshua E. Goldberg, D.O., an otolaryngologist (ear, nose, and throat specialist).  R. 1765-99.  In a December 3, 2008 letter to Drs. Henwood and Weber, Dr. Goldberg conveyed his impression that Plaintiff had positional vertigo.[5]  R. 1767.  Although Goldberg had elicited a positive result on a test for vertigo during Plaintiff's December 2008 office visit, he was unable to do so in her follow-up visit on January 8, 2009, and all other tests for vertigo produced normal results.  R. 1768-69.

On January 12, 2009, Plaintiff completed a functional capacity examination conducted by Marc C. Cohen, D.C. to determine whether Plaintiff was able to perform sedentary work.  Dr. Cohen's February 6, 2009 report and records reflect that Plaintiff gave "reliable" and "maximal" effort throughout the evaluation, but professed inability or declined to perform numerous tasks because of her tremor.  R. 1590-1621.  Cohen found that she was "unable to perform the essential sedentary job duty" and was "fully disabled."  R. 1595.  He found her typing skills "poor."  Id. Cohen concluded that Plaintiff was "both physically and mentally incapable of performing her required job skills . . . for Quest Diagnostics nor does she have the ability to return to **_any_** gainful employment."  R. 1596 (emphasis in original).

---

[5] Stedman's Medical Dictionary at 1958 (27th ed. 2000) defines "benign positional vertigo" in part as "brief attacks . . . that occur solely with certain head movements or positions, e.g., with neck extension . . . ."

During the administrative appeal, Aetna forwarded Plaintiff's entire medical claim file to seven more independent doctors specializing in areas that corresponded to the injuries claimed. Although Aetna's doctors did not examine Plaintiff, many reviewed the entire file more than once in order to accommodate Plaintiff's submission of additional medical information.  Each of these qualified professionals concluded that the records did not support a finding that Plaintiff was functionally impaired from performing her own occupation at Quest Diagnostics or other sedentary work.

Lawrence Blumberg, M.D., board certified in orthopedic surgery, reviewed the entire claim file twice:  first on September 17, 2008, and again on March 25, 2009.  R. 1722-26, 1728-33.  Dr. Blumberg attempted to conduct a peer-to-peer consultation with Dr. Yucha, Plaintiff's treating chiropractor, but Yucha declined.  On March 25, 2009, Blumberg opined:

> In spite of the claimant's subjective complaints, there are no physical examination findings or clinical testing results that support impairment. . . . I cannot comment on whether she has an impairment at the neuropsychiatric level, but from an orthopedic basis there is no evidence the claimant cannot stand, sit, or ambulate.  There is no evidence she cannot lift up to ten pounds, although this is not a major portion of her job.

R. 1732.

Malcolm McPhee, M.D., board certified in physical medicine and rehabilitation, reviewed the claim file twice:  first on September 23, 2008, and again on March 25, 2009.  R. 1693-99, 1700-06.  Dr. McPhee attempted to complete a peer-to-peer consultation with Dr. LaBorde, Plaintiff's M.D. who specialized in the same area as McPhee, but LaBorde advised him that she was no longer treating Plaintiff.  LaBorde referred Aetna to Dr. Natasha Falcon.  Aetna placed the claim appeal on hold, waiting for medical information from Falcon, but Plaintiff did not

14

provide Aetna with any additional information from Falcon.  R. 1636, 2393-94.  On March 25,

2009, McPhee found "no evidence of structural or electrophysiological abnormalities."  R. 1705.

He found the "neuropsychological testing [performed by Drs. Gur and Thysen] was not an

accurate reflection of her cognitive abilities because of her variable effort."  Id.  He further found

that Plaintiff's completion of the neuropsychological testing, along with her reported activities at

home, demonstrated that she could perform sedentary work.  Id.  He noted that Dr. Yucha,

Plaintiff's chiropractor, had reported improvement in her ability to perform activities of daily

living.  Id.  McPhee also noted that Dr. Joshua Goldberg's ear, nose, and throat exam had

produced some evidence of benign vertigo.  Id.  McPhee found that "[t]he functional capacity

evaluation was self limited for most of the testing . . . mak[ing] any conclusions of questionable

validity."  Id.

Gerald Goldberg, M.D., board certified in psychiatry and neurology, reviewed the claim

file twice:  first on September 29, 2008, and again on March 25, 2009.  R. 1708-14, 1716-21.  Dr.

G. Goldberg opined that "[t]he newly provided information does not change my previous opinion

that from a purely neurological standpoint, the claimant does not have any clinical proven

neurologic problems that would preclude her from being able to work . . . ."  R. 1712.  He noted

that Dr. Weber's  2008 neurological evaluations did not "comment on the presence of significant

tremor, and it is noted that the tremor comes out with stress and anxiety, and it is not exactly

clear as to how often this is."  R. 1712.  G. Goldberg found that it was "unclear as to exactly

when the claimant's complaints of vertigo have come up," and he opined that the symptoms of

vertigo "would not be a factor influencing her ability to work in a sedentary position that does

not require constant bending or turning of her head."  Id.

15

Kevin Murphy, Ph.D., certified by the American Boards of Disability Analysts and Professional Disability Consultants, reviewed the entire claim file on three occasions:  October 14, 2008, December 1, 2008, and April 6, 2009.  R. 1673-79, 1683-90, 1666-71.  On November 25, 2008, Dr. Murphy conducted a peer-to-peer consultation with Dr. Shin, Plaintiff's treating psychiatrist.  Shin reported that Plaintiff was "doing better," but was "still fragile."  R. 1688.  Shin also told Murphy that Plaintiff had "crying spells, panic attacks, and psychological seizures" that Shin had not witnessed but understood Plaintiff had experienced.  Id.  Shin had witnessed "tremors of the head and hands," "crying spells, and anxiety attacks."  Id.  Shin acknowledged Murphy's concern that "since the claimant had a history of exaggerating her problems on neuropsychological exam that it was important for [him] to differentiate between what the claimant said and what Dr. Shin had observed."  Shin explained that "there were some things she was not in a position to observe."  Id.  On April 6, 2009, Murphy found there was no new evidence of a functional impairment reflected in Shin's records, which documented only Plaintiff's "reported symptoms without any formal mental status findings or other medical evidence."  Id.  Murphy also discounted the results of Dr. Cohen's functional capacity evaluation, noting Plaintiff's refusal to perform multiple tasks.  R. 1669-71.

Richard Snyder, D.O., board certified in preventive medicine with a general certification in occupational medicine, completed his review of the claim file on April 10, 2009.  R. 1655-64.  Dr. Snyder found the diagnostic studies and clinical data did not account for Plaintiff's reported symptoms, such as increasing headaches, TJM, and memory problems:  "Findings consistently indicate the claimant is neurologically stable and that her reported tremor is psychogenic based and not the result of a structural or neurologic injury."  R. 1663.  He noted mild cervical and

lumbar degenerative changes that would not restrict her activities.  Id.  He found the medical data

supported restrictions only on rapid movements from sitting to standing, and on frequent head

and neck rotation, which limitations would not affect her ability to perform sedentary work.  R.

1663.  Snyder noted that Plaintiff had self-limited the  neuropsychological evaluation.  Id.

Although Dr. Cohen had concluded Plaintiff's tremors precluded her completion of the

functional capacity evaluation, Snyder noted that Cohen had not questioned the basis for her

inability or refusal to perform certain tasks.  Id.  Snyder concluded:

> Restrictions and limitations outlined by the providers appear to be in excess of the
> provided medical documentation.  This includes restrictions opined by Dr. Shin, who
> indicates the claimant is "disabled" from her own or any occupation . . . , followed
> by a January 2009 statement indicating an ongoing lack of functional abilities for
> unskilled or semiskilled activities.  Medical data provided is not supportive of these
> statements and/or findings.

R. 1664.

Michael Gerber, P.C., chiropractor, completed his review of the claim file on May 25,

2009.  R. 1643-54.  Dr. Gerber conducted a peer-to-peer consultation with Dr. Yucha, Plaintiff's

treating chiropractor.  R. 1652.  Yucha told Gerber that Plaintiff was not able to work due to

increased pain from headaches, bilateral trapezius muscle pain, neck pain, and low back pain.

However, Yucha stated that "the only orthopedic test . . . [of] any significance for this claimant

was a positive foraminal [nerve canal] compression test for localized neck pain."  Id.  Gerber

noted that "Yucha did not mention anything related neurologically to muscle testing, reflexes or

sensory issues and objectively did not mention anything in the claimant's lower back and lower

extremities."  Id.  Gerber concluded that despite Plaintiff's subjective complaints, "there are no

physical examination findings or clinical testing results that support impairment. . . . [T]here is

no evidence that the claimant cannot sit, stand, or ambulate and there is no evidence she cannot lift up to 10 pounds . . . ."  R. 1653.

Ross Clark, M.D., board certified in otolaryngology, completed his review of the claims file on June 17, 2009.  R. 1735-39.  Dr. Clark conducted a peer-to-peer consultation with Dr. Joshua Goldberg, Plaintiff's treating otolaryngologist.  R. 1738.  Dr. Clark noted that "claimant is apparently able to read a book and watch TV at home and is primarily bothered by the dysequilibrium [positional vertigo] with sudden movements of her head. . . . [T]here were no positive physical findings referable to her dysequilibirum." R. 1738.

III.   ANALYSIS

Summary judgment is appropriate when the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a), (c).

It is undisputed that inasmuch as the plan gives Aetna, as the administrator, sole discretion to make eligibility determinations and construe terms of the plan, the applicable standard for review is the deferential arbitrary and capricious standard required by Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  Here, Aetna was both the insurance carrier for the policy funding the plan and the administrator of the plan.  This dual role created a conflict of interest, which must be considered a decisional factor under Firestone[6] and Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 108 (2008)[7]; accord Doroshow v. Hartford Line & Accident Ins. Co.,

---

[6]  In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989), the Court held that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion."  Id. at 115.

[7]  In Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 128 S. Ct. 2343 (2008), in which  MetLife both funded the plan and had discretionary authority to determine the validity of an employee's benefits claim, thereby involving the same type of conflict as this case, the Court came to the identical conclusion as in Firestone.

574 F.3d 230, 233-34 (3d Cir. 2009), cert. denied, 130 S. Ct. 1060 (U.S. 2010) (conflict of interest considered as one factor among others where the insurer both funded the plan and was responsible for determining plan eligibility).

Under an arbitrary and capricious (or abuse of discretion) standard of review,[8] a court may overturn a plan administrator's decision only if it is "without reason, unsupported by substantial evidence, or erroneous as a matter of law." Abnathya v. Hoffmann-La Roche, Inc., 2 F.3d 40, 45 (3d Cir. 1993) (citation and internal quotation marks omitted). Our scope of review is "narrow, and the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." Id. at 45 (citation and internal quotation marks omitted). Furthermore, "under most circumstances, 'the record for arbitrary-and-capricious review of ERISA benefits denial is the record made before the plan administrator, and cannot be supplemented during litigation.'" Howley v. Mellon Fin. Corp., 625 F.3d 788, 793 (3d Cir. 2010) (quoting Kosiba v. Merck & Co., 384 F.3d 58, 67 n.5 (3d Cir. 2004)). In determining whether a decision is arbitrary and capricious, it must be considered whether the administrator had a reasonable basis for its decision, based on the facts known to the administrator at the time of the decision. Smathers v. Multi-Tool, Inc., 298 F.3d 191, 199-200 (3d Cir. 2002).

We do not find any support in the record for Plaintiff's assertion that Aetna's decision was arbitrary and capricious. The record also does not support any finding that Aetna failed to comply with the procedures required by the plan or by ERISA. Instead, the record clearly demonstrates the contrary.

---

[8] "The 'arbitrary and capricious' standard is essentially the same as the 'abuse of discretion' standard." Abnathya v. Hoffmann-La Roche, Inc., 2 F.3d 40, 45 n.4 (3d Cir. 1993); accord Estate of Schwing v. Lilly Health Plan, 562 F.3d 522, 526 n.2 (3d Cir. 2009).

Plaintiff submits that Aetna's dual role as both the insurer and the administrator of the plan creates a conflict of interest that "resonates throughout . . . all aspects of this claim." Pl. Br. at 3, Doc. No. 27. Plaintiff broadly describes the proposed conflict: "It is in Aetna's interest to deny as many claims as possible in order to save itself money," contending that Aetna's February 19, 2008 decision to deny Plaintiff benefits under a separate group life insurance provision evidences the conflict. Pl.'s Br. at 20, Doc. No. 27; Def.'s 2/19/08 letter, R. 522-23. However, Plaintiff has not provided any evidence to show that Aetna's business interests as an insurance carrier affected its claims handling in general or its decision on eligibility for benefits in this case. Also, the facts regarding Plaintiff's claim for life insurance benefits and Aetna's decision in regard to that claim are not part of the administrative record on review here.[9] Moreover, a careful review of the administrative record does not reveal any bias or conflict that affected Aetna's decision to deny disability benefits. Therefore, Aetna's conflict of interest has been accorded negligible weight in this arbitrary-capricious review.

Review of the administrative record reveals that Aetna's benefits determination was thorough and careful. Aetna acted responsibly in response to a claim of daunting complexity. The record contains extensive treatment notes and records from 15 of Plaintiff's treating physicians and health care providers, detailing a multitude of reported symptoms. Plaintiff's reported symptoms not only fluctuated over time, but also were inconsistent with objective diagnostics test results. The opinions of her treating physicians were supported largely by Plaintiff's subjective complaints. She occasionally reported improvement to her own health care

---

[9] Although Aetna's February 19, 2008 letter is contained in the administrative record, R. 522-23, Plaintiff has not provided any other information about the claim for group life insurance benefits. See also Def.'s Br. at 5, Doc. No. 25 (noting that Plaintiff never appealed the February 19, 2008 decision).

providers.  During the initial determination of benefits, Aetna provided Plaintiff's entire medical file to two independent physicians who specialized respectively in neuropsychology and in psychiatry and neurology.  During the appeal, Aetna allowed Plaintiff to submit additional medical information.  Aetna then provided the entire supplemented medical file to seven different independent physicians who specialized in areas that corresponded to the claimed injuries:  neurology, neuropsychology, orthopedic surgery, physical medicine and rehabilitation, occupational medicine, chiropractic medicine, and otolaryngology.  Aetna thus was required to evaluate the opinions and records of 25 physicians and health care providers.

Plaintiff maintains that Aetna's "doctors refused to give any credence to Plaintiff's complaints" and "assumed that because a pathologic condition was not demonstrated by diagnostic testing, it [did] not exist."  Pl.'s Br. at 16, Doc. No. 27.  The record in this case reflects otherwise.  Aetna did not ignore her subjective complaints.  Aetna's consulting physicians took all of her subjective reports seriously, but could not identify any objective medical findings that accounted for the extent or severity of the reported symptoms.  Aetna's consultants further found that Plaintiff had exaggerated some symptoms and had self-limited other evaluations.  Aetna's doctors had good reason to doubt the opinions of Plaintiff's treating physicians that she was not able to perform her own occupation or another sedentary position because those opinions were primarily grounded on Plaintiff's subjective complaints.  Finally, Aetna's doctors found that Plaintiff had reported an overall improvement in her physical and mental condition.

Aetna's reliance on the opinions of its own consultants over the opinions of Plaintiff's treating physicians does not render its denial of benefits arbitrary and capricious.  Administrators

of ERISA plans are not required to defer to the opinions of a participant's treating physicians. Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831 (2003); Orvosh v. Program of Group Ins. for Salaried Emps. of Volkswagen of Am., Inc., 222 F.3d 123, 127-31 (3d Cir. 2000) (administrator's denial of benefits upheld despite the opinion of claimant's treating physician that claimant was totally disabled).  Seven of Aetna's consultants reviewed all of the medical records submitted in support of Plaintiff's claim, including those of her treating physicians.  Many of Aetna's consultants reviewed the entire file more than once and in one instance, three times.  As reflected in their reports, Aetna's consultants considered and addressed both the subjective complaints and physical examination findings observed by Plaintiff's treating physicians, along with their diagnoses and impressions.  Moreover, Aetna's reliance on the opinions of highly qualified medical specialists demonstrates that its decision was reasonable.

That the conclusions of Aetna's consultants were based on a paper review, rather than a physical examination, does not show that Aetna acted arbitrarily and capriciously.  See, e.g., Dolfi v. Disability Reins. Mgmt. Servs., Inc., 584 F. Supp. 2d 709, 735 (M.D. Pa. 2008) (administrator's paper-records review not arbitrary and capricious); Schlegel v. Life Ins. Co. of N. Am., 269 F. Supp. 2d 612, 627-28 (E.D. Pa. 2003) (administrator reasonably relied solely on a review of records by its own non-treating physicians).  Because more than five months had passed between the motor vehicle accident that injured Plaintiff and her initial claim for benefits, the decision to forego an examination was reasonable.  By the time Plaintiff initiated the appeal, more than a year had passed since the accident.  There appeared to be little objective data to be gained by an examination.  Aetna's decision to forego an independent medical examination of Plaintiff was reasonable.

Plaintiff maintains that Aetna failed to consideration all relevant diagnoses.  Pl.'s Br. at 16, Doc. No. 27.  In support of this assertion, Plaintiff points to statements by three of Aetna's consulting physicians, Drs. Blumberg, Gerber, and Mendelssohn, who acknowledged that they could not offer opinions outside their areas of expertise.  Pl.'s Br. at 16, 23-25, 26, Doc. No. 27.  However, these doctors acted responsibly in stating the limits of their specialities.  Plaintiff also asserts that Aetna did not address the neurological opinions of her treating physicians.  Id. at 23.  However, Aetna's consultants, Drs. G. Goldberg, Cohan, and Mendelssohn in particular, fully addressed those opinions.  Plaintiff has not provided any evidence or reason to conclude that Aetna selectively ignored diagnoses.

Plaintiff maintains that Aetna failed to consider how her impairments affected her ability to perform the job duties specifically required by Quest Diagnostics.  Pl.'s Br. at 25, Doc. No. 27.  The record does not support this assertion.  Drs. Gur and Thyssen's neuropsychological evaluation found among many other positive findings that Plaintiff was able to work for extended periods of time with only small breaks, showed no difficulty understanding verbal directions, and her concentration was generally adequate for task performance.  In the June 24, 2009 decision letter, Aetna specifically considered Drs. Gur and Thyssen's evaluation along with the reports and records of Plaintiff's treating physicians in the context of her ability to perform sedentary work.  It is undisputed that Plaintiff was employed in a sedentary, office-clerical position.  Although Drs. Gur and Thyssen assessed Plaintiff's ability to type at a low performance level, the record does not show that her poor typing skills would have impaired her ability to update contracts and enter data in a computer, which were the duties required of her by Quest Diagnostics, as described by Plaintiff.

Plaintiff submits that after this action commenced, the Social Security Administration granted her application for disability benefits and ultimately, it was decided that she was disabled as of January 12, 2007, the date of the accident.  Pl.'s Br. at 13-14, Exs. A, B, Doc. No. 27. Plaintiff contends that in light of the SSA award, Aetna should have not have refused benefits. However, a plan administrator need not always reconcile its determination with those of the SSA. See Goletz v. Prudential Ins. Co. of Am., 383 Fed. App'x 193, 198 (3d Cir. 2010) (finding no reason to view the SSA's contrary determination as evidence of an abuse of discretion given that the SSA considered evidence that was different than the evidence available to the administrator); Burk v. Broadspire Servs., Inc., 342 Fed. App'x 732, 738 (3d Cir. 2009) (SSA determination of "disability" was not binding on the plan administrator, where the administrator's decision is governed by the plan terms rather than the SSA statute).

The inconsistency here between the SSA's determination and Aetna's decision does not demonstrates that Aetna abused its discretion.  The SSA award was not part of the administrative record at the time Aetna rendered its decision.  Furthermore, based on the summary judgment materials submitted by Plaintiff, it appears that the SSA was presented with materially different evidence than was presented to Aetna.  Along with the testimony of a vocational expert, the SSA apparently considered the opinions of Richard M. Cohen, M.D., who testified:

> [T]the claimant suffers with an anxiety related disorder in the form of . . . severe panic attacks manifested by sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week. . . . including recurrent and intrusive recollections of a traumatic experience . . . .

Pl.'s Br., Ex. B at 8, Doc. No. 27-3.  Thus, the SSA was presented with new evidence of a claim of disabling anxiety of apparently increased magnitude.  The SSA did not have the benefit of the expert medical opinions provided by Aetna in the administrative record before this Court.

24

Plaintiff maintains that Aetna's November 14, 2007 and June 24, 2009 decision letters are "inadequate and vague." Pl.'s Br. at 22-23, Doc. No. 27. We find Aetna adequately and fully explained its decision in accordance with Section 503 of ERISA, 29 U.S.C. § 1133. Aetna described in detail the medical evidence that was reviewed and the applicable plan provisions that were the basis for the decision. In the November 14, 2007 letter, Aetna advised that additional medical information could be submitted to complete the claim and explained how the decision could be appealed. In each letter, Aetna evaluated the medical records of Plaintiff's treating physicians, explaining in ordinary language why those records do not support the claimed disability. In the June 24, 2009 letter, Aetna again provided an evaluation of the voluminous medical evidence, discussing medical evidence that both supported and conflicted with its decision.

Contrary to Plaintiff's contention, Aetna's review and consideration of the entirety of the medical evidence satisfied its exacting administrative duty to Plaintiff, as required by the Supreme Court. See Glenn, 128 S. Ct. at 2350 (discussing the "higher-than-marketplace quality standards" that ERISA imposes on insurers). Aetna's refusal of disability benefits was reasonable and supported by substantial evidence. Accordingly, Plaintiff's motion for summary judgment will be denied and Defendant's motion will be granted.

An appropriate order accompanies this memorandum.

BY THE COURT:

/s/ Legrome D. Davis

Legrome D. Davis, J.